IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  05-cv-01450-CBS-BNB

ROXANN LOUGHRAY,
    Plaintiff,
v.

HARTFORD GROUP LIFE INSURANCE COMPANY,
    Defendant.

---

MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Craig B. Shaffer

    This civil action comes before the court for review of the administrative record regarding Ms. Loughray's claim for long-term disability benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1132(a)(1)(B).  Pursuant to the Order of Reference dated November 21, 2005 (doc. # 21), this action was referred to the Magistrate Judge to handle all dispositive matters including trial and entry of a final judgment in accordance with 28 U.S.C. 636(c), Fed. R. Civ. P. 73, and D.C. COLO. LCivR 72.2.  On October 30, 2006, this action was reassigned by Chief Judge Lewis T. Babcock from Magistrate Judge Patricia A. Coan to Magistrate Judge Craig B. Shaffer. The court has reviewed the Complaint, Hartford's Opening Brief (filed June 13, 2006) (doc. # 42), Ms. Loughray's Brief in Support of Motion for Judgment on the Administrative Record (filed June 13, 2006) (doc. # 43), Hartford's Response Brief on the Administrative Record (filed July 7, 2006) (doc. # 53), Ms. Loughray's Response to Hartford's Opening Brief (filed July 7, 2006) (doc. # 54), Hartford's Reply Brief on the

Administrative Record (filed July 24, 2006) (doc. # 56), Ms. Loughray's Reply Brief (filed July 24, 2006) (doc. # 57), the supplements (filed on August 17, 2006) (docs. # 62 and # 63), the administrative record (doc. # 45), the exhibits and affidavits, the entire case file, the arguments made at the hearings held on August 17, 2006 and January 24, 2007, and the applicable law and is sufficiently advised in the premises.

I.      Statement of the Case

Ms. Loughray was employed by Ultimate Electronics as a salesperson from September 20, 1992 to April 20, 2000. (*See* doc. # 43 at p. 2 ¶ 1). Ms. Loughray was paid a commission on sales. Ms. Loughray's work schedule was nine hours per day, five days per week. As a salesperson, Ms. Loughray interacted with customers, demonstrated the use of products, and operated credit card processors, cash registers, and other store equipment. (*Id.* at pp. 2-3 ¶ 1). Ms. Loughray stopped working for Ultimate Electronics on April 20, 2000 due to the "culmination of a progression of symptoms that began after a head injury on January 26, 1999, and which may have been acerbated [sic] by a flare-up of long-standing thyroid condition." (*Id.* at p. 3 ¶ 2). On July 15, 2000, Ms. Loughray submitted a claim for long term disability benefits pursuant to the Ultimate Electronic Group Disability Plan (hereinafter "the Plan"), then administered by CNA Group Benefits.[1] (*See* doc. # 42 at p. 5 ¶ 18). Ms. Loughray was

---

[1]     CNA Group Benefits issued the Group Long Term Disability Policy to Ms. Loughray's employer, Ultimate Electronics. As Hartford acquired CNA Group Benefits effective January 1, 2004, Hartford was named as Defendant in this action. Hartford does not dispute that it is the proper party in this action.

2

eligible for and received long term disability benefits under the Plan beginning on July 20, 2000.  (*See* doc. # 45 at p. 728).  By a letter dated January 14, 2002, Hartford notified Ms. Loughray of its intention to terminate long term disability benefits under the Plan effective December 19, 2001.  (*See* doc. # 42 at p. 14 ¶ 79).

On February 24, 2002, Ms. Loughray requested reconsideration of the termination of benefits, asserting that she remained disabled.  (*See* doc. # 43 at p. 10 ¶ 12;  doc. # 45 at pp. 583-84).  Ms. Loughray requested and received an extension and submitted additional medical information.  (*See* doc. # 45 at pp. 564-568).  On March 12, 2002, Hartford informed Ms. Loughray that the additional materials did not support the reinstatement of disability benefits and forwarded her claim as an appeal.  (*See* doc. # 45 at p. 578).  Hartford denied Ms. Loughray's appeal on August 5, 2002, explaining that the earlier decision to terminate benefits was correct because the information presented did "not support *continuous* inability to perform your work activity."  (*See* doc. # 45 at pp. 198) (emphasis in original).

On October 23, 2002, Ms. Loughray requested and was permitted to submit additional medical information for further review.  (*See* doc. # 45 at pp. 117-136).  On October 31, 2002, Hartford again upheld the termination of disability benefits.  (*See* doc. # 45 at pp. 85-87).  On March 12, 2004, Ms. Loughray submitted additional medical information, including neuropsychological test results.  (*See* doc. # 45 at pp. 65-72).  Hartford did not alter its decision to terminate benefits.

Proceeding *pro se*, Ms. Loughray filed this civil action on or about August 2, 2005.  Counsel entered his appearance on behalf of Ms. Loughray on February 27,

2006.  Ms. Loughray alleges Hartford improperly denied her long term disability benefits ("LTD") in violation of 29 U.S.C. §§1132(a)(1)(B).  She seeks reimbursement of disability benefits from January 1, 2001 to the present with interest, reinstatement in the Plan, and attorney fees and costs or, in the alternative, remand to the Plan administrator.  (*See* doc. # 43 at p. 20; doc. # 54 at p. 19).[2]  Hartford asserts that substantial evidence in the administrative record supports its determination that Ms. Loughray was not entitled to continued disability benefits under the Plan.

II.     Standard of Review

"ERISA provides a detailed and comprehensive set of federal regulations governing the provision of benefits to employees by employers, including disability benefits."  *Hall v. Unum Life Ins. Co. of America*, 300 F.3d 1197, 1200 (10th Cir. 2002). "ERISA specifically gives a plan beneficiary the right to federal court review of benefit denials and terminations."  *Hall*, 300 F.3d at 1200 (citing 29 U.S.C. § 1132(a)).

"Where, as here, an ERISA plan grants a plan administrator or a delegate discretion in interpreting the terms of, and determining the grant of benefits under" the plan, the court must "uphold the decision unless arbitrary and capricious."  *Adamson v. Unum Life Ins. Co. of America*, 455 F.3d 1209, 1212 (10th Cir. 2006) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113-15 (1989)).  *See also Fought v. UNUM Life Ins. Co.*, 379 F.3d 997, 1004 (10th Cir. 2004) ("because the plan grants UNUM

---

[2]     At oral argument held on August 17, 2006, Ms. Loughray clarified that she seeks 24 months of disability benefits under the Plan, 18 months of which have already been paid by Hartford.

discretion, [a] court reviewing a challenge to a denial of employee benefits . . . applies an arbitrary and capricious standard to a plan administrator's actions") (internal quotation marks and citation omitted), *cert. denied*, 544 U.S. 1026 (2005).  "In applying the arbitrary and capricious standard, the decision will be upheld so long as it is predicated on a reasoned basis."  *Adamson*, 455 F.3d at 1212 (citation omitted).  "In fact, there is no requirement that the basis relied upon be the only logical one or even the superlative one."  *Adamson*, 455 F.3d at 1212 (citation omitted).  "The district court's responsibility [lies] in determining whether the administrator's actions were arbitrary or capricious, not in determining whether [plaintiff] was, in the district court's view, entitled to disability benefits."  *Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 381 (10th Cir. 1992).

"The possibility of an administrator operating under a conflict of interest, however, changes the analysis."  *Fought*, 379 F.3d at 1003 (citation omitted).  "Since *Firestone*, all of the circuit courts agree that a conflict of interest triggers a less deferential standard of review."  *Fought*, 379 F.3d at 1003 (citation omitted).  Where a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, the Tenth Circuit has "explicitly adopted" the "sliding scale" approach to judicial review of the administrator's decision.  *Fought*, 379 F.3d at 1004 (citing *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 2004)).  *See also Adamson*, 455 F.3d at 1213-14 ("Though we discern no basis for applying any other than a 'pure arbitrary and capricious' standard in this case, we apply the 'standard conflict' sliding scale of deference in accordance with our precedent").

"Under [the sliding scale] approach, the reviewing court will always apply an arbitrary and capricious standard, but the court must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict." *Fought*, 379 F.3d at 1004 (quoting *Chambers*, 100 F.3d at 825). Where "a fiduciary plays more than one role pursuant to ERISA" and "the plaintiff cannot establish a serious conflict," the court "will view the conflict of interest as one factor in determining whether the plan administrator's denial of benefits was arbitrary and capricious." *Fought* 379 F.3d at 1005. *See also Adamson*, 455 F.3d at 1212 ("We do note that where a 'standard' conflict of interest exists, the plan administrator's decision is entitled to less deference, and the standard conflict is regarded 'as one factor in determining whether the plan administrator's denial of benefits was arbitrary and capricious' ") (quoting *Fought*, 379 F.3d at 1005). Where fiduciaries have "an inherent conflict of interest, . . . the burden is on the fiduciary to establish by substantial evidence that the denial of benefits was not arbitrary and capricious." *Fought* 379 F.3d at 1005. As Hartford is both the insurer and the administrator of the Plan, the court applies the less deferential standard, requiring the plan administrator to "demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." *Fought*, 379 F.3d at 1006.

The court treats "the terms 'arbitrary and capricious' and 'abuse of discretion' as interchangeable in this context." *Fought*, 379 F.3d at 1003 n.2 (citation omitted). "[I]n reviewing a plan administrator's decision for abuse of discretion, the federal courts are

limited to the 'administrative record' -- the materials compiled by the administrator in the course of making his decision."  *Hall v. Unum Life Ins. Co. of Am.*, 300 F.3d 1197, 1201 (10th Cir. 2002) (quoting *Sandoval*, 967 F.2d at 380 ("In determining whether the plan administrator's decision was arbitrary and capricious, the district court generally may consider only the arguments and evidence before the administrator at the time it made that decision")).  *See also Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) (compiling cases and stating that "[m]ost circuits have declared that, in reviewing decisions of plan fiduciaries under the arbitrary and capricious standard, district courts may consider only the evidence that the fiduciaries themselves considered").

"A lack of substantial evidence often indicates an arbitrary and capricious decision."  *Adamson*, 455 F.3d at 1212 (citation omitted).  Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker]."  *Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276, 1282 (10th Cir. 2002) (internal quotation marks and citations omitted).  "In determining whether the evidence in support of the administrator's decision is substantial, we must take into account whatever in the record fairly detracts from its weight."  *Caldwell*, 287 F.3d at 1282 (internal quotation marks and citations omitted).  "The substantiality of the evidence is evaluated against the backdrop of the administrative record as a whole."  *Adamson*, 455 F.3d at 1212 (citation omitted).

III.    Analysis

Ms. Loughray first argues that the physician who performed an independent review of her medical records, Eugene Truchelut, M.D., was not sufficiently independent for the court to rely on his medical judgment. The court disagrees.

Dr. Truchelut is an independent medical consultant hired by Hartford to review medical claim files. "Dr. Truchelut maintained his own private practice as a Board Certified specialist in Internal Medicine at all times that he provided independent medical consulting services to CNA Group Benefits." (Affidavit of Cheryl A. Sauerhoff (doc. # 62) at ¶ 8; *see also* Independent Contractor Agreement (Exhibit A to Sauerhoff Affidavit)). Dr. Truchelut has engaged in independent consultant agreements with CNA Group Benefits but has never been employed by CNA Group or Hartford. (*See* Sauerhoff Affidavit at ¶¶ 4, 5; Exhibit A to Sauerhoff Affidavit). Use of the title "Medical Director" in connection with CNA Group Benefits' Citibank account "did not signify the existence of an employment relationship between Dr. Truchelut and CNA Group Benefits*."* (*See* Sauerhoff Affidavit at ¶ 9). There is no basis to conclude that the contractual relationship between Dr. Truchelut and Hartford transcended the usual relationship between a professional and his client. There is no evidence that the content of Dr. Truchelut's reports was at Hartford's direction or control. The evidence simply does not support Ms. Loughray's argument that Dr. Truchelut's evaluations were unreliable due to a lack of independence.

Ms. Loughray also argues that it was arbitrary and capricious to rely on Dr. Truchelut's review of Ms. Loughray's medical records when he did not personally examine her. To the contrary, Hartford's "reliance on its consulting doctors' paper

review of the medical records" was not arbitrary and capricious.  *Atkins v. SBC Communications, Inc.*, 200 Fed. Appx. 766, 773-74 (10th Cir. 2006) (citing *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004) ("It is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled") (citation omitted);  *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 577 (7th Cir. 2006) (finding no "authority that generally prohibits the commonplace practice of doctors arriving at professional opinions after reviewing medical files") (citation omitted), *cert. denied*, 127 S. Ct. 234 (2006);  *Voight v. Metropolitan Life Ins. Co.*, 28 F. Supp. 2d 569, 580 (C.D. Cal. 1998) ("the mere fact that MetLife accepted the opinions of its independent medical reviewers rather than those of Voight's treating physicians is not proof of arbitrary or capricious conduct") (citations omitted)).

Ms. Loughray next argues that Hartford improperly denied her claim for long-term disability benefits for disabling headaches and associated impairments.  (*See* doc. # 43 at p.13; doc. # 54 at p. 2).  "[T]he court examines whether [Hartford] made a reasonable interpretation of its Plan and whether substantial evidence supports [Hartford's] application."  *Lewis v. ITT Hartford Life and Accident Ins. Co.*, 395 F. Supp. 2d 1053, 1062 (D. Kan. 2005).

Under the terms of the Plan, "disability"

means that during the *Elimination Period* and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

>    1.   continuously unable to perform the *Material and Substantial Duties of Your Regular Occupation*; and
>    2.   not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

(*See* doc. # 45 at p. 10).  Under the terms of the Plan, an insured is required to provide written notice of his or her disability within 30 days of the date of disability, or as soon as possible.  (*See* doc. # 45 at p. 13).  Thereafter, an insured must provided written proof of loss and provide the following information:  (1) the date the disability began; (2) the cause of disability; (3) the prognosis of disability; (4) proof that claimant is receiving appropriate and regular care for her condition from a doctor, who is not the claimant or a member of claimant's immediate family; (5) objective medical findings which support claimant's disability; (6) the extent of claimant's disability, including restrictions and limitations which are preventing claimant from performing her regular occupation; (7) appropriate documents of claimant's monthly earnings, including disability earnings; (8) if applicable, proof that claimant was contributing to the premium cost; (9) the name and address of any hospital or health care facility where claimant has been treated for the disability; and (10) if applicable, proof of incurred costs covered under other benefits included in the policy.  (*See* doc. # 45 at pp. 13-14).  The Plan further states that claimant may be asked to submit continuing proof of disability and that the insurer has the right to have a doctor examine claimant while the claim continues.  (*See* doc. # 45 at pp. 16-17).

On September 14, 2000, Hartford approved payment of Ms. Loughray's claim for long term disability benefits "based on the diagnosis of Thyroid Dysfunction . . . and not

Fibromyalgia." (*See* doc. # 45 at p. 728; *see also* pp. 638, 731).  Hartford informed Ms. Loughray that she had an obligation to remain under the regular care of a physician and "to provide proof of [her] continuing disability." (*See* doc. # 45 at p. 728).  After contacting Ms. Loughray by telephone to check her medical status, Hartford extended Ms. Loughray's benefits through July 9, 2001.  (*See* doc. # 45 at pp. 635-38).

On or about October 25, 2001, Hartford reviewed Ms. Loughray's medical records and referred the file to Dr. Eugene Truchelut, Hartford's independent medical examiner, based on "complaints of subjective symptoms with diffuse diagnostic data to support" them.  (*See* doc. # 45 at pp. 603, 634).  Dr. Truchelut reviewed Ms. Loughray's medical records and concluded that Ms. Loughray's thyroid condition was corrected by late May 2000.  (*See* October 28, 2001 report (doc. # 45 at pp. 100-103)).  Dr. Truchelut saw "no evidence of thyroid dysfunction after that time, including the laboratory measurements of TSH, free T4, and free T3." (*See* doc. # 45 at p. 103).

The medical records submitted to Hartford and reviewed by Dr. Truchelut began in April 2000 with Ms. Loughray's visit to the Boulder Community Hospital Mapleton Center Emergency Department.  (*See* doc. # 45 at pp. 795-800).  Ms. Loughray reported a recent reduction in her thyroid medication and complained of "low thyroid," "Thyroid Crisis, Anxious, Shaky" and "tearful." (*See* doc. # 45 at pp. 795, 796, 798).  Ms. Loughray's TSH level was low and she was referred to her primary care physician to "go back to original dose of thyroid medication." (*See* doc. # 45 at pp. 797, 799).

In May of 2000, multiple lab tests were normal or negative, and her TSH and T4 levels were normal.  (*See* doc. # 45 at pp. 741-51, 801-807).  An MRI of Ms. Loughray's

11

brain performed on June 3, 2000 was determined "to be within normal limits." (*See* doc. # 45 at pp. 790-91).  A detailed neurological examination performed in June of 2000 by Dr. H. Rai Kakkar was "unremarkable," according to Dr. Truchelut. (*See* doc. # 45 at pp. 100, 779-89).  On June 19, 2000, Thomas Higgins, M.D. reported that "Patient clinically euthyroid . . . her symptoms - not related to her thyroid." (*See* doc. # 45 at p. 743; Stedman's Medical Dictionary (27th ed. 2000) (Euthyroidism is "condition in which the thyroid gland is functioning normally, its secretion being of proper amount and constitution")).

Ms. Loughray consulted Dr. Pierre Brunschwig at the Wellspring for Women Clinic in Boulder, Colorado from July 13, 2000 to on or about August 2, 2001. (*See* doc. # 45 at pp. 98, 100).  Dr. Brunschwig ordered multiple tests and treated Ms. Loughray for multiple symptoms. (*See* doc. # 45 at pp. 703-05, 717-20).  The test results were generally normal and Ms. Loughray's symptoms occasionally improved. (*See* doc. # 45 at pp. 517-22, 679-86, 703-05, 717-20)   On January 15, 2001, Dr. Brunschwig reported to Hartford that Ms. Loughray could work 10 hours per week at her previous job. (*See* doc. # 45 at p. 711).  However, on April 5, 2001, Dr. Brunschwig communicated to Hartford that Ms. Loughray would require 2 to 3 more months of treatment. (*See* doc. # 45 at p. 702).

On May 10, 2001, Ms. Loughray consulted Dr. Rebekah Gass, a specialist in infectious disease.  Dr. Gass concluded that "it does not appear that there is an overt source of an infectious etiology to her fatigue. . . ." (*See* doc. # 45 at p. 719).  Dr. Gass ordered numerous tests, including a chest x-ray, which all yielded negative or normal

results.  (*See* doc. # 45 at pp. 695, 721-25).

On June 29, 2001, Ms. Loughray consulted Dr. Patrick Moran, a hematologist. (*See* doc. # 45 at pp. 696-97).  Dr. Moran reached no definitive conclusions about Ms. Loughray's condition.  (*See* doc. # 45 at pp. 696-97).

Because the results of stool analysis tests done at Dr. Brunschwig's direction were not available, Dr. Truchelut contacted Dr. Brunschwig on November 1, 2001. (*See* doc. # 45 at p. 98).  Dr. Brunschwig indicated that he could not provide any information about Ms. Loughray's condition after August 2, 2001.  (*See* doc. # 45 at p. 98).  Dr. Brunschwig stated that on August 2, 2001, Ms. Loughray "was in stable condition."  (*See* doc. # 45 at p. 98).

On August 29, 2001, Ms. Loughray was evaluated at National Jewish Medical Center Sleep Laboratory for possible sleep disturbance.  At that time, Ms. Loughray did not complain of headaches.  (*See* doc. # 45 at pp. 359).  A detailed physical examination and a CAT Scan of the head were unrevealing and blood tests and neurological examination results were normal.  (*See* doc. # 45 at pp. 359-62, 655-57).

On November 6, 2001, Dr. Truchelut reviewed additional medical records that Ms. Loughray had provided.  The additional information provided by Ms. Loughray did not alter Dr. Truchelut's previous evaluation.  (*See* doc. # 45 at p. 97).  Dr. Truchelut reviewed test results from Quest Diagnostics dated March 23, 2001, from Great Smokies Diagnostic Laboratory dated July 28, 2001, and from Quest Diagnostics dated July 27, 2001, all of which were within normal limits.  (*See* doc. # 45 at pp. 416-20, 517, 535, 537).  A physical examination and extensive laboratory tests performed on August

15, 2001 revealed normal results. (*See* doc. # 45 at pp. 466-469, 473-83). A polysomnogram performed on October 1, 2001 by Dr. Jonathan Woodcock indicated "marginal sleep quality" and "reduced sleep efficiency." (*See* doc. # 45 at pp. 456-57). Dr. Woodcock recommended a therapeutic trial of supplemental oxygen. (*See id.).* On October 18, 2001, Dr. Woodcock reported that thyroid levels "are normal." (*See* doc. # 45 at p. 228). Hartford upheld the termination of Ms. Loughray's disability benefits effective December 19, 2001.

On July 25, 2002, Dr. Truchelut once again reviewed additional medical records provided by Ms. Loughray. Once again, the additional information did not alter Dr. Truchelut's previous evaluation. (*See* doc. # 45 at pp. 94-96). The records showed a consultation regarding headaches and a prescription for supplemental oxygen. An electroencephalogram performed on January 29, 2002 resulted in no significant findings. (*See* doc. # 45 at pp. 560-62). A neurological examination and an MRI by Dr. Ronald Murray on February 13, 2002 revealed normal findings. (*See* doc. # 45 at pp. 278-80, 563). Laboratory tests on April 15, 2002 and April 25, 2002 were largely negative and normal. (*See* doc. # 45 at pp. 459-62). Ms. Loughray also consulted Robert L. Rogers, a physician's assistant at the Mayo Clinic in Scottsdale, Arizona. (*See* doc. # 45 at pp. 174, 179-80). Her physical and neurological examinations were normal. Rogers recommended Botox treatment that was initiated by Eric Eross, D.O. on August 6, 2002 without complications. (*See* doc. # 45 at p. 175). A "general medical examination" by Dr. Andrea Cohen in September of 2002 "was normal. (*See* doc. # 45 at pp. 169, 168-73). Dr. Truchelut maintained his conclusion that the medical

records did not "clearly establish a functional impairment, at least from a physical standpoint, which would have precluded claimant from her work activity as of 12/20/01 and continuing." (*See* doc. # 45 at p. 89). Hartford again upheld the termination of Ms. Loughray's disability benefits effective December 19, 2001.

Ms. Loughray challenges Hartford's determination that the medical information furnished did not demonstrate that she was disabled under the Plan. The court concludes that Hartford's determination was reasonable and supported by substantial evidence.

Hartford reviewed Ms. Loughray's voluminous medical records, relied on Dr. Truchelut's assessment of those records, and communicated personally with Ms. Loughray on many occasions. Dr. Truchelut performed a thorough review of the medical records, including extensive supplemental medical information furnished by Ms. Loughray. Dr. Truchelut reviewed the medical opinions of Ms. Loughray's many treating physicians, including neurologists and other specialists. (*See* doc. # 45 at pp. 94-103).

There is evidence in the record that Ms. Loughray's headaches were related to her hyperthyroid condition that commenced in April of 2000. The records demonstrate that the thyroid condition was controlled by the time that Hartford terminated Ms. Loughray's disability benefits. (*See, e.g.,* doc. # 45 at p. 228 (on October 18, 2001, thyroid levels "are normal")). After her thyroid condition was controlled, Ms. Loughray experienced sleep difficulties that were adequately treated, according to the record.

Ms. Loughray's medical records show a plethora of symptoms and extensive

evaluations by numerous physicians without any definitive conclusions.  Despite Ms. Loughray's many subjective complaints, the physical, laboratory, and radiological findings were inconclusive.  For example, with regard to Ms. Loughray's complaints of a head injury, Hartford noted on October 31, 2002 that ""[h]er memory and concentration problems have not been evidenced by any treatment provider or documented by any formal testing."  (*See* doc. # 45 at pp. 86-87).  During the time period relevant to Hartford's determination, there is not sufficient evidence of any disability based on a head injury.

There were periods of several months for which there were no records of medical treatment or findings.  These gaps in treatment did not support a finding of disability.  The objective medical evidence did not support the conclusory opinions rendered by some of her treaters that she was unable to work.  (*See, e.g.,* doc. # 45 at pp. 225, 515 (letters from chiropractor Tom Groover that "there is no way for [Ms. Loughray] to do her former occupation or other occupations at this time" without any accompanying medical records); p. 581 (note from Julie Stapleton that Ms. Loughray "is currently medically disabled from competitive employment" without any accompanying medical records)).  One treater's recommendation that Ms. Loughray do more cardiovascular exercise activity was not consistent with Ms. Loughray's allegation of disability.  (*See* doc. # 45 at p. 96).

In sum, the record supports Hartford's termination of disability benefits.  *See Sandoval*, 967 F.2d at 382 ("Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the

[decisionmaker]") (internal quotation marks and citation omitted).  Hartford has "demonstrate[d] that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." *Fought*, 379 F.3d at 1006.  Accordingly,

IT IS ORDERED that judgment on the Complaint shall enter in favor of Defendant Hartford Group Life Insurance Company and against Plaintiff Roxann Loughray.

Dated at Denver, Colorado this 2nd day of April, 2007.

BY THE COURT:

   s/Craig B. Shaffer
United States Magistrate Judge